UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD SUTKA, on behalf of himself
and others similarly situated,

        Plaintiff,

v.

YAZAKI NORTH AMERICA INC.,

        Defendant.

_____/

Case No. 17-10669

Paul D. Borman
United States District Judge

Stephanie Dawkins Davis
United States Magistrate Judge

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR CONDITIONAL CLASS CERTIFICATION WITHOUT PREJUDICE

This is a putative collective action brought pursuant to the Fair Labor

Standards Act, 29 U.S.C. § 216(b) ("**FLSA**"). Plaintiff Todd Sutka, who works as a

Resident Engineer for Defendant Yazaki North America, Inc. ("**Yazaki**"), alleges

that he and other Resident Engineers have been improperly classified as "exempt"

by Yazaki, and consequently denied overtime pay to which they are entitled.

Before the Court is Plaintiff's Motion for Conditional Class Certification.

Conditional certification of a plaintiff class in an FLSA collective action hinges on

whether the members of the proposed class are "similarly situated." Because the

evidence in the record before the Court is insufficient to establish that the members

of Plaintiff's proposed class are in fact similarly situated, the Court will deny

Plaintiff's Motion for Conditional Class Certification without prejudice.

# I.  BACKGROUND

## A.  Evidence Regarding Resident Engineers

Collective actions to remedy an employer's violations of the FLSA may be instituted "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The question presented here is whether the evidence in the record shows that the members of the proposed plaintiff class are "similarly situated" enough to justify preliminary certification of, and collective action notice to, that class. The proposed class is "**[a]ll current and former Resident Engineers who were employed by Yazaki at any time from March 3, 2014 to the present.**" (Pl.'s Mot. at 15, Pg ID 237 (emphasis in original).) The relevant evidence concerns the mostly static nature of a particular job classification over several years, rather than a chronological series of events, and the Court will review those items of evidence in turn.

### 1.  Plaintiff's Declaration

Plaintiff's primary piece of evidence is a Declaration attached to his Motion for Conditional Class Certification. (Pl.'s Mot. Ex. A, Declaration of Todd Sutka.) In it, Plaintiff avers the following based on personal knowledge. (Sutka Decl. ¶ 3.)

Yazaki manufactures auto parts and sells its products globally to customers that include car manufacturers. (*Id.* ¶ 3.) Plaintiff, who has been employed by Yazaki for over ten years, works as a Resident Engineer. (*Id.* ¶ 2.) His primary responsibility

in that capacity is to "monitor and work with a vehicle assembly process, where [he assists] with production and assure[s] quality control of Yazaki components being installed." (*Id.* ¶ 4.) More specifically, Plaintiff avers that he "monitor[s] Yazaki's product quality, primarily working with [his] hands to physically diagnose, repair, and perform other maintenance and quality assurance-related activities for the automotive products." (*Id.*) Plaintiff holds no professional engineering licensure, was trained primarily on the job, and "report[s] to a Resident Engineering Supervisor or Manager." (*Id.*)

Until several years ago, Yazaki paid its Resident Engineers hourly, and compensated their overtime at 1.5 times their normal hourly rates. Later, but more than three years before this action was filed,[1] Yazaki declared that its Resident Engineers were "exempt" from overtime. (Sutka Decl. ¶ 6.) Under the new arrangement, which is still in effect, Resident Engineers are paid a "salary" for work

---

[1] The three years directly prior to the filing of the Complaint is the relevant time for the calculation of the applicable limitations period. *See Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 675 (6th Cir. 2012) ("An FLSA plaintiff generally has two years to file suit, but the statute of limitations increases to three years if the claim consists of a willful violation. An FLSA cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed.") (internal quotation marks and citations omitted) (citing 29 U.S.C. § 255(a) and *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 187 (6th Cir. 2008)). The record reflects that Yazaki declared Resident Engineers to be "exempt" employees in or around 2005. (*See* ECF No. 32, Def.'s Supp. Br. Ex. F, Deposition of Todd Sutka at 49:22-50:12.) So for present purposes, the relevant time period is the three years directly prior to the filing of the Complaint: March 3, 2014 to March 3, 2017.

up to 40 hours in a workweek. (*Id.*) They are then paid additionally for any hours they work in excess of 45 hours in a given workweek, but they are only compensated for those hours at the equivalent of their normal hourly rate. (*Id.*) Under this "straight overtime" pay structure, Resident Engineers do not receive the time-and-a-half overtime pay that they used to receive (and which Plaintiff alleges they are entitled to under the FLSA), and they are also effectively uncompensated for any hours in excess of 40 but short of 45 that they work in a given week. (*Id.*)

Plaintiff avers that Yazaki employs "many other individuals as salaried Resident Engineers" at Plaintiff's location and at plants around the country, and that "[b]ased on information [he has] come to know over [his] over 10 years working for Yazaki" as well as his "personal experience," Plaintiff understands "that other Resident Engineers at Yazaki have job duties and responsibilities that are similar to" his own. (Sutka Decl. ¶ 7.) Like Plaintiff, those other Resident Engineers "monitor and work with a vehicle assembly process and assist with production to assure quality control of the component parts being installed on the vehicles," and "monitor product quality and primarily perform physical labor to diagnose, repair, and perform other maintenance and quality assurance-related tasks." (*Id.*) They too "report to a Resident Engineer Supervisor or Manager." (*Id.*)

Plaintiff avers that Yazaki has "a uniform, written job description applicable to all Resident Engineers, [which] describes the substantially similar job duties and

responsibilities of all Yazaki Resident Engineers." (Sutka Decl. ¶ 7.) That written job description denotes all Resident Engineers as "'exempt' employees." (*Id.* ¶ 8.) Consistently with this, Plaintiff avers personal knowledge that other Resident Engineers are paid like he is: with a salary for the first 40 hours in a given workweek, and with "straight overtime" for the hours worked in excess of 45 in a given workweek. (*Id.*) Plaintiff closes his Declaration with the averment that he has "personal knowledge that other Resident Engineers work approximately five consecutive days at approximately 55 hours or more per week resulting in a significant amount of unpaid overtime compensation." (*Id.*)

## 2. Resident Engineer Job Description

The job description to which Plaintiff's Declaration refers is among Yazaki's own pieces of evidence. (Def.'s Resp. Ex. D, Resident Engineer Job Description.) The Resident Engineer Job Description refers to two positions: Resident Engineer and Senior Resident Engineer. Among the details set forth at its topmost section, the Resident Engineer Job Description categorizes both positions' "Status" as "Exempt," though it provides no further definition of the term. (*Id.* at 1, Pg ID 362.)

Under the heading "Position Summary," the Resident Engineer Job Description states: "Represent [Yazaki] at the customer location and provide all the required and needed support to keep the customer protected for any eventuality with the products supplied." (*Id.*) The "Duties and Responsibilities" listed for the position

fall into four categories:

- "Customer In-Plant Issue Management," which includes quality-control and maintenance functions such as "Monitor product quality at customer plant, including . . . audits, repair, and on-hold vehicles" and "Initially analyze all quality/design/logistics concerns and inform proper . . . project team member for corrective actions" (*id.*);

- "Customer In-Plant Continuous Improvement Initiatives," which includes the implementation of and participation in customer-defined initiatives as well as processes such as "vehicle reviews, line audits, [and] process reviews" (*id.*);

- "Communication Activities," which encompasses various customer-liaison duties, including attendance at on-site customer meetings and other program meetings, "maintain[ing] relationships with key customer personnel," and "[r]elay[ing] engineering issues to the appropriate engineer and follow through resolution" (*id.* at 1-2, Pg ID 362-63); and

- "Launch Support," which includes "[a]ssist[ing] the launch team with supporting builds [and] reviewing product readiness," attending "customer launch issues reviews," and "driv[ing] issues to closure" (*id.* at 2, Pg ID 363).

The Resident Engineer Job Description then lists ten responsibilities that are unique to Senior Resident Engineers. These include various training and mentorship functions; review and approval of certain types of work by Resident Engineers; "facilitat[ing] resolution for inadequate actions from support functions"; advising the superior "Resident Engineering Supervisor/Manager" in various respects, including Resident Engineer performance; and assuming certain responsibilities of the "Resident Engineering Supervisor/Manager" in his or her absence, including

"[p]rovid[ing] guidance and defin[ing] priorities to the Resident Engineering Group" and "[p]articipat[ing] in internal or external meetings on behalf of Supervisor/Manager Resident Engineering as needed." (Resident Engineer Job Description at 2, Pg ID 363.)

Finally, the Resident Engineer Job Description lists minimum requirements for both Resident Engineer and Senior Resident Engineer positions. Resident Engineer positions require an associate's degree in "Quality Engineering or related field," and in terms of special skills, require "[e]ffective customer contact skills" and "[s]trong analytical abilities." (*Id.* at 2-3, Pg ID 363-64.) The unique prerequisites for a Senior Resident Engineer position are a bachelor's degree in "Quality Engineering or related field," and "[d]emonstrated proficiency in the interpersonal and professional skills to work with others in a senior position." (*Id.* at 3, Pg ID 364.) For both positions, manufacturing experience is preferred, as well as "[e]xperience in automotive launch of electrical distribution systems" and "[e]xperience in assessment of quality issues, implementation of containment activities and root cause analysis problem solving techniques." Both positions require foreign and domestic travel, on-call availability, and as a physical requirement, the "[a]bility to walk/stand in assembly plant environment for extended periods of time (8hrs +)." (*Id.* at 2-3, Pg ID 363-64.) Neither position has professional certification prerequisites. (*See id.* at 2, Pg ID 363.)

7

### 3. Defendant's Declarations: Baker, Garbarino, VanElls

In addition to the Resident Engineer Job Description, Yazaki has submitted three Declarations by managerial employees regarding the responsibilities of Resident Engineers across the company, and in Plaintiff's case specifically.

#### a) Edwin Baker

Edwin Baker is Yazaki's General Director. (Def.'s Resp. Ex. A, Declaration of Edwin Baker ¶ 2.) Baker avers the following on personal knowledge. (*Id.* ¶ 3.)

From March 2014 until the date of Baker's Declaration (August 9, 2017), Yazaki has employed a total of 71 Resident Engineers. Of the 71, 10 are or were employed in a position Baker refers to as "Resident Engineer II,"[2] and 11 are or were employed as Senior Resident Engineers. All 71 earned a salary of at least $455 per week. 60 are active employees, and the remaining 11 are former employees. They are (or were) divided among three business units: 46 in the Original Equipment Manufacturer ("**OEM**") business unit, 19 in the Trans-Pacific Nikkei Operations ("**TPNO**") business unit, and six in the Tesla business unit.[3] Eight of the 71 are (or

---

[2] Baker does not specify what distinguishes a Resident Engineer from a "Resident Engineer II" in his Declaration. The parties do not mention the distinction in their briefs, and both the Resident Engineer Job Description and Plaintiff's deposition testimony acknowledge only two grades of seniority: Resident Engineers and Senior Resident Engineers. (Resident Engineer Job Description at 1, Pg ID 362; ECF No. 32, Def.'s Supp. Br. Ex. F, Deposition of Todd Sutka at 31:4-9, 96:19-97:16.)

[3] Baker avers that each business unit is responsible for a different set of customers. Customers of the OEM business unit include Ford Motor Company, FCA US LLC,

were) located in Canada. (*Id.* at ¶¶ 5-9; ECF No. 34, Pl.'s Supp. Br. at 6, Pg ID 661.)

For at least the past three years, Plaintiff has worked under Resident Engineer Supervisor Nicholas VanElls, who during that period has also supervised six other Resident Engineers. All seven Resident Engineers under VanElls's supervision work in the OEM business unit. The remaining 64 current or former Resident Engineers have been supervised by a total of 18 other Resident Engineer Supervisors throughout numerous facilities at approximately 17 different locations. (*Id.* ¶ 10.)

Baker's Declaration sets forth in detail the particular geographical locations, business units, and seniority characteristics of the 71 current and former Resident Engineers. (*Id.* ¶¶ 11-24.) Taken all together, what these averments demonstrate is that only three other current and former Resident Engineers have worked at the same Toledo, Ohio facility as Plaintiff, while the rest have worked at various facilities across the United States and in Canada. Thus, three other Resident Engineers work or worked in the same geographical location as Plaintiff, six other Resident Engineers work or worked under the same supervisor, and 45 other Resident Engineers work or worked within the same business unit.

Baker also avers that 13 of the 71 current or former Resident Engineers have

---

and General Motors, LLC. (Baker Decl. ¶ 4.) Customers of the TPNO business unit include Subaru, Toyota Motor Corporation, Mazda Motor Corporation, Honda Motor Company, Ltd, and Nissan Motor Company Ltd. (*Id.*) Tesla, Inc. has its own dedicated business unit. (*Id.*)

had bachelor's degrees, at least two earned more than $100,000 from their employment with Yazaki in 2014, at least five earned more than $100,000 from their employment with Yazaki in 2015, and at least four earned more than $100,000 from their employment with Yazaki in 2016. (*Id.* ¶¶ 24-27.) Baker does not indicate whether Plaintiff falls within any of those categories.

Finally, Baker avers that the Resident Engineer Job Description "accurately describes the job responsibilities of Yazaki's Resident Engineers, Resident Engineer II's and Senior Resident Engineers and is a record maintained by Yazaki in the regular course of business." (*Id.* ¶ 28.)

### b) Timothy Garbarino

Timothy Garbarino is the Director of Quality for Yazaki's TPNO business unit. (Def.'s Resp. Ex. B, Declaration of Timothy Garbarino ¶ 2.) His Declaration focuses chiefly on similarities and differences between different Resident Engineer positions, and he avers the following on personal knowledge. (*Id.* at 11, Pg ID 351.)

Garbarino avers that "the primary and most important job responsibility of Yazaki's Resident Engineers is to interface with Yazaki's customers regarding quality issues related to the products Yazaki sells to the various manufacturing plants." (*Id.* ¶ 5.) This is "non-manual work and . . . not production work," and principally requires the Resident Engineer to "develop and build a relationship of trust between Yazaki and the customer related to the quality of the parts supplied by

Yazaki to its customers." (*Id.* ¶ 17.) The various ways in which Resident Engineers do this include monitoring the lines where Yazaki products are installed for quality issues, tracking and reporting such issues, representing the company at meetings with plant personnel, and recommending changes to Yazaki's products and processes as well as those of its customers. "In short," Garbarino avers, "the Resident Engineer acts as the face of Yazaki to the customer." (*Id.* ¶ 18.) The customer-facing nature of the position also requires Resident Engineers to analyze and address customer concerns with Yazaki products, diagnose the causes of product issues, communicate with Yazaki engineers regarding any defects in product quality, and "exercise significant independent judgment and discretion in making recommendations to Yazaki's customers regarding changes to their internal processes and procedures [if it is determined] that the root cause of the quality issues relates to the processes and procedures of the customer." (Id. ¶ 19.) Garbarino also identifies two other duties that Resident Engineers undertake: they are "are responsible for maintaining the integrity of Yazaki's engineering process and ensuring the quality of Yazaki products that are delivered to its customer," and they are "responsible for ensuring that Yazaki appropriately and efficiently controls costs at the plant level." (*Id.* ¶¶ 21-22.)

Garbarino avers that the "specific day-to-day tasks of the Resident Engineers vary depending upon the needs of the respective customer, work schedule of the

respective plant, and other individual circumstances of the assignment." (*Id.* ¶ 6.) Garbarino identifies several dimensions of a Resident Engineer's job that vary in this way: the standard work hours (which the customer typically dictates) (*id.* ¶ 7); the geographic location (*id.* ¶¶ 8-9); whether the Resident Engineer is stationed at the customer's plant or at a Yazaki facility (*id.* ¶ 11); the amount of direct customer interaction, as opposed to communication via electronic means (*id.* ¶ 15); whether the customer treats the Resident Engineer as an integrated member of the customer's staff, or more like a consultant (*id.* ¶ 16); and the number of plants for which the Resident Engineer is responsible (*id.*). Based on the customer that any given Resident Engineer is assigned to, he or she is required to be familiar with a particular set of materials, parts, and products. (*Id.* ¶ 24.)

Garbarino avers that "[i]deally, Resident Engineers should not spend any time performing physical and manual labor. On occasion, Resident Engineers perform a minimal amount of physical labor such as repairing minor defects in parts." (*Id.* ¶ 26.) But this "is not a Resident Engineer's primary duty" and "if performed at all by a Resident Engineer, [it] typically does not exceed five hours per week." (*Id.*)

Finally, Garbarino confirms in his Declaration that Resident Engineers are classified as "exempt" employees, that they are paid on a salary basis, and that they receive "Straight Time Overtime" for hours worked in excess of 45 in a week, which is calculated by dividing the Resident Engineer's salary by 2080 and applying the

result as the hourly rate. (*Id.* ¶ 27.)

### c) Nicholas VanElls

Nicholas VanElls is employed by Yazaki as a Resident Engineer Supervisor. Eight of Yazaki's Resident Engineers report to him, including Plaintiff. (Def.'s Resp. Ex. C, Declaration of Nicholas R. VanElls ¶¶ 2-3.) VanElls avers the statements in his Declaration on personal knowledge. (*Id.* at 8, Pg ID 360.)

Most of VanElls's Declaration is either literally or materially identical to the Garbarino Declaration. In the non-duplicative portions of his Declaration, VanElls avers that during his time as Plaintiff's supervisor, Plaintiff has worked "out of the Jeep plant in Toledo, Ohio," and that "his job duties and responsibilities have pertained to assisting FCA US LLC and its corporate predecessor, Chrysler Group, LLC, with the production of its Jeep brand motor vehicles. Currently, [Plaintiff] is the primary Resident Engineer for the Jeep Wrangler." (*Id.* ¶¶ 6-7.)

VanElls (like Garbarino) avers that "[t]he primary and most important job responsibility of Yazaki's Resident Engineers is to interface with Yazaki's customers regarding quality issues related to the products Yazaki sells to the various manufacturing plants." (*Id.* ¶ 9.) VanElls also reiterates that "specific day-to-day tasks of the Resident Engineers vary depending upon the needs of the respective customer, work schedule of the respective plant, and other individual circumstances of the assignment," and that the position's primary responsibilities entail "the

13

performance of nonmanual work and . . . not production related work." (*Id.* ¶¶ 9-11.)

### 4. Plaintiff's Supplemental Declaration

In a Supplemental Declaration submitted as an exhibit to his Reply in support of the Motion for Conditional Class Certification (ECF No. 22, Pl.'s Reply Ex. A, Supplemental Declaration of Todd Sutka), Plaintiff avers additional facts regarding two specific topics raised by Yazaki in its Response to the instant Motion: namely, the amount of autonomy and discretion that Plaintiff has as a Resident Engineer, and the sources of his knowledge regarding the duties of other Resident Engineers.

First, Plaintiff acknowledges that Yazaki characterizes its Resident Engineers as exercising "significant independent judgment" but disputes the accuracy of this statement, at least when it comes to his own job. He avers that his "primary duties as a Resident Engineer are to observe, react, and communicate on quality control issues," and that he "often function[s as] a liaison between Yazaki and the owner of the plants" where he is assigned. (Sutka Supp. Decl. ¶¶ 3-4.) Plaintiff avers that his supervisor is considerably more involved in any decision-making related to the quality-control process, in part because his supervisor has advance information and attends meetings to which Plaintiff is not privy. (*Id.* ¶ 5.)

As to the sources of his knowledge about other Resident Engineers' responsibilities, Plaintiff avers that he is familiar with the duties of other Yazaki Resident Engineers because he has worked at other facilities (including a Fiat

14

Chrysler plant in Belvidere, Illinois as well as the Hyundai Mobis and Hi-Lex N.A. plants near his primary workplace in Toledo), and because he "personally know[s] Resident Engineers who work at the Dodge Ram plant in Warren, Michigan and the Jefferson North plant in Detroit, where the Durango and Grand Cherokee are built." (*Id.* ¶ 7.) Based on his experience and on his interactions with those individuals, Plaintiff avers that "Resident Engineers who work for Yazaki, at least at Fiat Chrysler, Hyundai Mobis, and Hi-Lex plants, have the same responsibilities and duties as [he does], and fall under the same job description." (*Id.* ¶ 7.)

### 5. Plaintiff's Deposition

The final item of evidence in the record is Plaintiff's deposition, taken on September 20, 2017. (ECF No. 32, Def.'s Supp. Br. Ex. F, Deposition of Todd Sutka.) After conducting Plaintiff's deposition, the parties filed supplemental briefs with the Court's leave in order to address any effect the deposition might have on the conditional class certification issue. (ECF No. 32, Def.'s Supp. Br.; ECF No. 34, Pl.'s Supp. Br.)

Plaintiff testified in his deposition that he has been assigned to the Jeep plant in Toledo, Ohio since the facility's inception in 2005. (Sutka Dep. 45:19-46:13.) He further testified that during the past three years, he has (with some variation) split his work hours equally between that facility; a Hyundai Mobis facility in Toledo; a Hi-Lex Industries facility in Hudson, Michigan; and a Yazaki sequencing facility in

Toledo that services FCA plants. (Sutka Dep. 38:25-40:1.) He has never worked within the TPNO or Tesla business units, and does not know "how a resident engineer at the Tesla plant [or any of the TPNO plants] spends their day." (Sutka Dep. 66:12-67:4, 105:6-15.) During the relevant time, he has not worked for a General Motors facility or a Ford facility, and has only worked at FCA facilities. (Sutka Dep. 67:20-25.)

Plaintiff also testified about his work at (and his interactions with Resident Engineers who worked at) the facilities he mentioned in his Supplemental Declaration: the Dodge Ram plant in Warren, Michigan; the FCA plant in Belvidere, Illinois; and the Jefferson North Plant in Detroit, Michigan, which manufactures Durango and Grand Cherokee vehicles. Plaintiff last performed work at the Warren facility in 2006, but has communicated by email with one or more Resident Engineers at that facility since then. (Sutka Dep. 106:15-109:2.) Plaintiff worked at the Belvidere facility for a few weeks in the late spring or summer of 2017, and he spoke to the employees of that facility about their job responsibilities while he was there, but has not observed them working firsthand. (Sutka Dep. 109:4-112:11.) As to the Jefferson North Plant in Detroit, Michigan, Plaintiff testified that he is acquainted with Resident Engineers who work at that facility, but has not been to the plant and only bases his understanding of its Resident Engineers' job responsibilities on the fact that they have the same job description as he does. (Sutka

Dep. at 221:22-222:20.)

Finally, Plaintiff testified that Senior Resident Engineers have certain managerial duties that Resident Engineers do not have, and that he himself has never worked as a Senior Resident Engineer. (Sutka Dep. 32:13-15, 249:18-250:8.)

## B. Procedural History of this Case

Plaintiff filed the Complaint in this action on March 3, 2017. (ECF No. 1, Compl.) The Complaint asserted two claims: one under the FLSA (Count I), and one under the Ohio Prompt Pay Act ("**OPPA**"), Ohio Rev. Code § 4113.15.

On April 5, 2017, Yazaki filed a Partial Motion to Dismiss, seeking dismissal of the OPPA claim on the basis of language in the Ohio statute limiting recovery to cases involving unpaid wages that are not in dispute. (ECF No. 8.) Plaintiff filed a timely Response, and Yazaki filed a timely Reply. (ECF Nos. 12, 13.) In an Opinion and Order entered on June 9, 2017, the Court granted Yazaki's motion and dismissed the OPPA claim, leaving only the FLSA claim in the action.

Plaintiff filed the instant Motion for Conditional Class Certification on July 19, 2017. (ECF No. 18, Pl.'s Mot.) The parties fully briefed the Motion. (ECF No. 21, Def.'s Resp.; ECF No. 22, Pl.'s Reply.) Then, on November 7, 2017, the Court entered a Stipulated Order permitting the parties to file supplemental briefs based on Plaintiff's deposition testimony, which had been conducted after the first round of briefs was filed. The parties filed supplemental briefs shortly thereafter. (ECF No.

32, Def.'s Supp. Br.; ECF No. 34, Pl.'s Supp. Br.)

The Court held a hearing on Plaintiff's Motion for Conditional Class Certification on November 29, 2017, and the Motion is now ripe for adjudication.

## II.   DISCUSSION

### A.   Standards Governing Conditional Certification of a Collective FLSA Action

The FLSA "requires employers to pay time-and-a-half for employee labor exceeding forty hours per week." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 545 (6th Cir. 2006) (citing 29 U.S.C. § 207(a)). The statute further provides that an action to remedy violations of this provision may be brought against an employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* Thus, "[u]nlike class actions under Fed. R. Civ. P. 23, collective actions under FLSA require putative class members to opt into the class." *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 583 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).

"Section 216(b) establishes two requirements for a representative action: 1) the plaintiffs must actually be 'similarly situated,' and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action." *Comer*, 454 F.3d at

546 (citing 29 U.S.C. § 216(b) and *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 167-68 (1989)). The threshold issue in the conditional certification inquiry is "whether plaintiffs have shown that the employees to be notified are, in fact, 'similarly situated.'" *Comer*, 454 F.3d at 546. If the plaintiffs sustain their burden at this stage, the Court "may use its discretion to authorize notification of similarly situated employees to allow them to opt into the lawsuit." *Id.*

The Sixth Circuit recently examined the FLSA's "similarly situated" standard in *Monroe v. FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017), and held that for a court applying that standard, "[t]wo governing principles from our case law serve as guides: plaintiffs do not have to be identically situated to be similarly situated, and the FLSA is a remedial statute that should be broadly construed." *Id.* at 402 (internal quotation marks and citation omitted). "Noting that '[s]howing a "unified policy" of violations is not required,'" the court in *Monroe* explained that "employees who 'suffer from a single, FLSA-violating policy' *or* whose 'claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct,' are similarly situated." *Monroe*, 860 F.3d at 398 (emphasis in original) (quoting *O'Brien*, 575 F.3d at 584–85). The court identified "three non-exhaustive factors" relevant to this analysis: "(1) the factual and employment settings of the individual[ ] plaintiffs; (2) the different defenses to which the plaintiffs may be subject on an individual basis; and (3) the

degree of fairness and procedural impact of certifying the action as a collective action." *Id.* (alteration in original) (internal quotation marks and citation omitted) (quoting *O'Brien*, 575 F.3d at 584).

"Courts typically bifurcate certification of FLSA collective action cases. At the notice stage, conditional certification may be given along with judicial authorization to notify similarly situated employees of the action." *Id.* at 397 (citing *Comer*, 454 F.3d at 546). "Once discovery has concluded, the district court—with more information on which to base its decision and thus under a more exacting standard—looks more closely at whether the members of the class are similarly situated." *Id.* (citing *Comer*, 454 F.3d at 547). "The 'first stage' or notice standard is 'fairly lenient,' requiring only that Plaintiffs 'submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exists.'" *Fisher v. Michigan Bell Telephone Co.*, 665 F. Supp. 2d 819, 825 (E.D. Mich. 2009) (quoting *Olivo v. GMAC Mtg. Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004)). At this preliminary stage, "[t]he Court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Id.* (internal quotation marks and citation omitted) (quoting *Brasfield v. Source Broadband Servs., LLC*, 257 F.R.D. 641, 642 (W.D. Tenn. 2009)). The standard is lenient in part because conditional certification "does not produce a class with an independent legal status, or join additional parties to the

action. The sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court." *Gaffers v. Kelly Servs., Inc.*, 203 F. Supp. 3d 829, 843 (E.D. Mich. 2016) (internal quotation marks and citations omitted) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)).

"At this stage, courts consider factors such as whether potential plaintiffs have been identified; whether affidavits of potential plaintiffs have been submitted; and whether evidence of a widespread unlawful policy or plan has been submitted." *Anderson v. P.F. Chang's China Bistro, Inc.*, No. 16-14182, 2017 WL 3616475, at *7 (citing *Olivo*, 374 F. Supp. 2d at 548). Affidavits or declarations of representative plaintiffs are "not required to meet the same evidentiary standards applicable to motions for summary judgment because to require more at this stage of the litigation would defeat the purpose of the two-stage analysis under Section 216(b)." *Fisher*, 665 F. Supp. 2d at 826 (internal quotation marks and citation omitted). After all, the court "has the opportunity to revisit the 'similarly situated' determination following the completion of discovery, usually in response to a motion for decertification." *Brown v. Ak Lawncare, Inc.*, No. 14-14158, 2015 WL 5954811, at *3 (E.D. Mich. Oct. 14, 2015) (Borman, J.) (internal quotation marks and citation omitted). "Nevertheless, affidavits submitted at the notice stage must still be based on the personal knowledge of the affiant." *Anderson*, 2017 WL

3616475, at *7 (E.D. Mich. Aug. 23, 2017) (citing *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 369 (E.D. Tenn. 2006)).

Perhaps most importantly for present purposes, "[a]lthough the standard for granting conditional certification is lenient, it is not non-existent." *Id.* (quoting *Cason v. Vibra Healthcare*, No. 10-10642, 2011 WL 1659381, at *3 (E.D. Mich. May 3, 2011)). Accordingly, courts in this District have not hesitated to deny conditional class certification in FLSA actions when they have found that the evidence proffered by the individual plaintiff or plaintiffs was too conclusory, speculative, or scant to support a finding that the members of the proposed class were similarly situated. *See, e.g., Swinney v. Amcomm Telecommunications, Inc.*, No. 12-12925, 2013 WL 28063, at *8 (E.D. Mich. Jan. 2, 2013) (denying conditional certification where the plaintiff "offered only his declaration in support of conditional certification" as evidence and "only provided conclusory allegations in support" of the declaration); *Demorris v. Rite Way Fence, Inc.*, No. 14-13777, 2015 WL 12990483, at *3 (E.D. Mich. Mar. 30, 2015) (denying conditional certification where the plaintiff "neither identified nor provided affidavits of potential plaintiffs," but merely "assert[ed] that he has personal knowledge of other similarly situated employees who were paid on the same basis as him"); *Shipes v. Amurcon Corp.*, No. 10-14943, 2012 WL 995362, at *10 (E.D. Mich. Mar. 23, 2012) (finding that the plaintiff's "bare-bones affidavit," which included "nothing more than mere

allegations that she and others like her were improperly classified as FLSA-exempt"
that "lack[ed] factual support," was "not enough to meet her burden at [the
conditional certification] stage").

## B.    Evidence of "Similarly Situated" Employees

Plaintiff's evidence consists of two sworn statements made by Plaintiff
himself: one Declaration attached as an exhibit to his Motion for Conditional Class
Certification, and one Supplemental Declaration attached to his Reply in support of
that motion. Plaintiff also relies to a certain degree on the Resident Engineer Job
Description, although that document was actually submitted as evidence by Yazaki.

In light of the decisions discussed above, there is little question that Plaintiff's
Declaration and Supplemental Declaration would be insufficient by themselves to
justify conditional class certification even under the lenient standard that applies at
the notice stage. As noted, the case law of this District is replete with decisions in
which courts have found that "sole declaration[s] [containing] conclusory
allegations" of one or even two individual plaintiffs, and nothing more, were
insufficient to warrant conditional class certification. *Swinney*, 2013 WL 28063, at
*9. *See also Anderson*, 2017 WL 3616475, at *11 & n.3 (declining to conditionally
certify a "nationwide class," and finding no decision by a court within the Sixth
Circuit that had done so, "based solely on two declarations that are vague as to any
other employee's experience"); *Demorris*, 2015 WL 12990483, at *3 ("Personal

knowledge alone . . . is not sufficient. Not only has Plaintiff failed to provide affidavits of potential class members, but Plaintiff has not identified a single person that can support his allegations of a common [unlawful] plan.") (internal citations omitted); *Shipes*, 2012 WL 995362, at *11 (declining to conditionally certify a class where the plaintiff had supplied a "bare-bones affidavit stat[ing] only" that she knew of "other, unspecified individuals" who were unlawfully denied overtime wages). In one illustrative 2016 case, the court observed that in a decision five years prior, yet another court in this District "noted that it [was] not aware of a single case in which conditional certification was granted based on the allegations of a single employee." *Langlands*, 2016 WL 4073548, at *4 (citing *Cason*, 2011 WL 1659381, at *2). The same holds true for this Court today.

Nor does Plaintiff's Supplemental Declaration, in which he elaborated on the basis of his personal knowledge of other Resident Engineers' job responsibilities, alter the analysis in any material way. That basis, according to the Supplemental Declaration, includes three weeks that Plaintiff spent at the FCA plant in Belvidere, Illinois, wherein he "communicated with and helped train other Resident Engineers, who were doing the same job that I do" at the Toledo facility; the time that Plaintiff has spent working at the Hyundai Mobis and Hi-Lex N.A. plants, where Plaintiff avers the REs "also perform the same duties that I do"; and Plaintiff's personal acquaintance with "Resident Engineers who work at the Dodge Ram plant in

Warren, Michigan and the Jefferson North plant in Detroit." (Sutka Supp. Decl. ¶ 7.)

Any inference that these averments show sufficient personal knowledge on Plaintiff's part, however, is weakened by Plaintiff's deposition testimony. Plaintiff testified, for example, that he has never been to the Jefferson North plant, and that although he knows that Resident Engineers there have the same job description as he does, he has never asked them how they perform their jobs. (Sutka Dep. 221:22-222:20.) Plaintiff identified only one Resident Engineer with whom he was acquainted at the Warren plant, and although he testified that he would email that Resident Engineer with questions about component parts, he also testified that he had never observed or asked about the specific responsibilities that that Resident Engineer had on a day-to-day basis, and that as a result he could make only an "educated guess" as to what they were. (Sutka Dep. 106:15-109:2.) As to the Belvidere plant, Plaintiff testified that he had not observed the work of Resident Engineers at that location, had not communicated with them about their work after his temporary deployment there ended, and did not know how much time they spent on maintenance, quality assurance, or data entry tasks. (Sutka Dep. 110:7-112:11.) Finally, Plaintiff testified that over the past three years, for the most part, he has been the only Resident Engineer assigned to the Hyundai Mobis and Hi-Lex N.A. plants. (Sutka Dep. 40:2-23, 41:8-12.)

Plaintiff did testify that Resident Engineers "deal with the same problems"

regardless of their location, and that the similarity between the Yazaki parts that Resident Engineers at all locations work with would allow him to work at other locations with relative ease, if necessary. (Sutka Dep. 256:13-257:8, 257:20-258:16.) But this testimony is no less generalized than the averments in Plaintiff's Declaration and Supplemental Declaration, and it does not cure the fundamental deficiency in Plaintiff's case for class certification: he has not provided sufficiently specific evidence—be it the statements of other Resident Engineers, or a colorable basis for his personal knowledge about the day-to-day work of Resident Engineers across the proposed class—to justify conditional certification of the plaintiff class he proposes.

The dispositive question, then, is whether Yazaki's Resident Engineer Job Description, considered in tandem with Plaintiff's Declaration and Supplemental Declaration, allows Plaintiff to meet his modest evidentiary burden. The Court concludes that it does not, because the evidence in the record strongly suggests that while the Resident Engineer Job Description serves as a baseline account of a Resident Engineer's duties, individual Resident Engineers have job characteristics beyond what is outlined in the Resident Engineer Job Description that materially differentiate them for the purposes of the "similarly situated" analysis. The Court arrives at this conclusion for three interrelated reasons.

First, Plaintiff testified that the Resident Engineer Job Description is a "base template" of his actual responsibilities as a Resident Engineer. (Sutka Dep. 96:7-16.) He then testified that responsibilities that he develops of his own volition in the course of working with a customer can constitute an important part of his job:

> Q. . . . Are there job duties . . . that aren't on the job description?
> A. Yeah, the customer interface that I've created of my own accord with all my different customers, working with them, helping with their problems, their own problems being that I'm at the facilities, helping them do their own problem solving of issues that might fall on my commodity.
> Q. What do you mean by that?
> A. Sometimes they have their own problems that they create. So like [Hyundai] Mobis is a tier-1 to the final assembly plant [and] they may have an issue going that's showed up at the OEM and so there's times I help them, you know, because it's my commodity, I help them with troubleshooting and solving problems and stuff like that and it's just something I developed my relationship with them, I try to help my customers in any way I can.
> Q. And that's an important part of your job, right?
> A. It's huge.

(Sutka Dep. 97:17-98:12.) Plaintiff's own testimony thus indicates that the Resident Engineer Job Description may not account for significant portions of a given Resident Engineer's day-to-day duties.

Second, the record suggests that there are gradations within the Resident Engineer position that could account for substantial variation from person to person with respect to duties and seniority. The Resident Engineer Job Description

encompasses two distinct positions—Resident Engineer and Senior Resident Engineer—and specifies particular qualifications and skills required for Senior Resident Engineers, as well as various training, mentorship, advisory, and supervisory functions that are unique to Senior Resident Engineers. In addition, Edwin Baker averred in his Declaration that besides the 11 individuals employed as Senior Resident Engineers, another 10 of the 71 Resident Engineers in the proposed class work in a position called "Resident Engineer II." This evidence is not rebutted or even addressed by Plaintiff. Baker's Declaration and the Resident Engineer Job Description therefore suggest that nearly a third of the members of the proposed class of Resident Engineers are in some way more senior or otherwise advanced than those in the standard Resident Engineer position.

Third, Yazaki has offered evidence that a substantial proportion of the proposed class may fall within different statutory exemptions to the FLSA. Baker averred that up to eleven members of the proposed class earned more than $100,000 in 2014, 2015, or 2016, and these Resident Engineers may fall within the FLSA's exemption for highly compensated employees.[4] Baker's Declaration and Timothy

---

[4] The version of the applicable regulation that was in effect until December 1, 2016 exempted from the FLSA any "employee with total annual compensation of at least $100,000 . . . if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee" as defined elsewhere in the regulations. 29 U.S.C. § 541.601(a) (2014) (amended May 23, 2016).

Garbarino's Declaration together evince that eight members of the proposed class resided and worked in Canada and an unspecified number resided and worked in Mexico, potentially entitling those Resident Engineers to invoke the FLSA's foreign-employee exemption.[5] Garbarino averred that at least 13 members of the proposed class held bachelor's degrees or advanced degrees, and Yazaki argues that these 13 Resident Engineers qualify for the FLSA's "learned professional" exemption.[6] (Apart from this, Yazaki takes the position that all 71 of the Resident Engineers fall within the FLSA's "administrative" exemption[7]; indeed, this is the reason Yazaki claims it classified them as exempt in the first place.) Based on this evidence, Yazaki argues that up to 32 Resident Engineers, and possibly more, may be exempt from the FLSA's minimum-wage requirement.

---

[5] Under 29 U.S.C. § 213(f), the provisions of the FLSA relevant in this case do not apply to "any employee whose services during the workweek are performed in a workplace within a foreign country" or certain U.S. territories.

[6] The "learned professional" exemption applies to employees whose primary duties involve "the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. §§ 541.300(a)(2), 541.301(a).

[7] Under 29 U.S.C. § 213(a), the FLSA provisions at issue in this case do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." To qualify for this exemption, an employee's primary duty "must be the performance of work directly related to the management or general business operations of the employer or the employer's customers," 29 C.F.R. § 541.201(a), and must also "include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a).

Sixth Circuit precedent is clear that "individualized defenses alone do not warrant decertification [of a plaintiff class in an FLSA collective action] where sufficient common issues or job traits otherwise permit collective litigation." *Monroe*, 860 F.3d at 404. Under that reasoning, it would also be premature to deny conditional certification to the proposed class in this case based solely on the prospective individualized defenses that Yazaki has identified, and the Court does not do so today. But the prospect of individualized defenses raised by Yazaki's evidence is relevant to the narrower question of whether the Resident Engineer Job Description, which undisputedly applies to all members of the proposed class, establishes that all members of that class are "similarly situated." The Court finds that Yazaki's evidence of potential individualized defenses weighs against such a conclusion because it generates an inference, unrebutted by Plaintiff, that there is enough employee-to-employee variation *within* the bounds of the Resident Engineer Job Description to weaken its value as evidence that all Resident Engineers are similarly situated. In other words, the Court's conclusion is not that Yazaki's evidence of potential individualized defenses alone warrants denial of conditional certification. Rather, it is that that evidence undermines the probative value of the Resident Engineer Job Description by demonstrating a substantial likelihood that employees to whom the Resident Engineer Job Description applies are not, in fact, similarly situated with regard to issues that will ultimately be claim-determinative

in this claim: the applicability of FLSA's statutory exemptions. And without the Resident Engineer Job Description, Plaintiff's arguments for conditional certification depend solely on his conclusory Declaration and Supplemental Declaration—which, for the reasons articulated above, cannot bear that weight.[8]

The cases cited by Plaintiff do not weigh in favor of a different result. In *Brown v. Ak Lawncare, Inc.*, No. 14-14158, 2015 WL 5954811 (E.D. Mich. Oct. 14, 2015) (Borman, J.), to take one representative example, this Court found that three plaintiffs who had asserted their "belief as to the existence of a widespread policy [that was] based on conversations with other [employees] who perform[ed] the same job functions" had made the "minimal assertions necessary to suggest a colorable basis for their claim." *Id.* at 3 (internal quotation marks and citations omitted). But

---

[8] The Court also notes that the parties have had some time to conduct discovery. Although Plaintiff moved for conditional certification just under two weeks after the parties filed a Joint Proposed Discovery Plan on July 6, 2017 (ECF No. 16), the Court entered a Stipulated Order Permitting the Parties to File Supplemental Authority on November 7, 2017 (ECF No. 30), after Plaintiff had been deposed and the parties agreed that his testimony was relevant to the instant Motion. Courts within this District have disagreed on whether the conditional certification standard is higher after discovery has been conducted. *Compare Bacon*, 2012 WL 6567603, at *3 ("The Court agrees that this matter is beyond the initial stage, necessitating a more exacting review of Plaintiffs' factual support for granting class certification. Here, Plaintiffs have engaged in at least four months of discovery.") *with Cason*, 2011 WL 1659381, at *2 n.2 ("Some courts apply a more stringent standard after some discovery has been conducted. The court declines to impose a more stringent standard at this stage.") (citations omitted). This Court offers no opinion on whether Plaintiff's burden is heightened by the four months that the parties had to conduct discovery, and merely notes that that fact makes Plaintiff's omission of specific evidence of other similarly situated Resident Engineers yet more notable.

in *Brown*, this Court was presented with the declarations of three plaintiffs rather than one, and in fact the Court specifically distinguished cases that "involved either a lone plaintiff who purported to represent a class of similarly situated individuals, or a few vague plaintiff declarations that were countered with a massive number of declarations submitted by defendant" from the case at bar. *Id.* at 4 (internal citations omitted) (citing *Simmons v. T-Mobile USA*, No. 06-1820, 2007 WL 210008 (S.D. Texas Jan. 24, 2007) and *Rodgers v. CVS Pharmacy, Inc.*, No. 05-770-27, 2006 WL 752831 (M.D. Fla. March 23, 2006)). All of the cases from this District that Plaintiff relies on are inapposite for the same reason, as they involved more substantial evidentiary showings than Plaintiff has made here. *See Fisher*, 665 F. Supp. 2d at 822 (declarations of 67 putative class members); *Wlotkowski*, 267 F.R.D. at 215 (declarations of 35 putative class members); *Lee v. Gab Telecom, Inc.*, No. 12-14104, 2013 WL 1632552, at *2 (E.D. Mich. Apr. 16, 2013) (declarations of the three named plaintiffs). In fact, Plaintiff cites only one decision from *any* district in which a court conditionally certified an FLSA plaintiff class based on a single plaintiff's allegations, but even that non-precedential decision concerned a greater showing than Plaintiff has made here: the court in that case noted that the plaintiff testified that he had had conversations with other putative class members from various job sites both "about the job in general" and regarding "the very

responsibilities that constituted Plaintiff's job." *Fairfax v. Hogan Transportation Equip., Inc.*, No. 2:16-CV-680, 2017 WL 4349035, at *5 (S.D. Ohio Sept. 29, 2017).

In summary, the balance of authority, and in particular the relevant case law from within this District, compels this Court to conclude that Plaintiff's declarations are too conclusory to support the certification of a nationwide plaintiff class in this matter. Further, based on Yazaki's evidence of substantial variation in the responsibilities of employees who fall under the Resident Engineer Job Description, the Court is not persuaded that the Resident Engineer Job Description sufficiently buttresses those declarations to allow Plaintiff to meet his evidentiary burden.

### III.  CONCLUSION

For the reasons stated above, the Court hereby DENIES Plaintiff's Motion for Conditional Class Certification without prejudice.

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

Dated:    MAR 1 2 2018